FILED
2017 Feb-10  PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIE ABNER, et al.,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | **2:15-cv-02040-KOB** |
| | ] | |
| **UNITED STATES PIPE & FOUNDRY** | ] | **This Document Relates to All Cases** |
| **COMPANY, LLC, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

These 13 consolidated cases involve Plaintiffs' allegations that Defendants operated a pipe-making facility in Birmingham, Alabama that released harmful chemical contaminants into areas occupied or frequented by Plaintiffs, causing personal injury and property damage. These cases are before the court on Plaintiffs' 13 Motions to Remand. (Doc. 11 in 2:15-cv-02040-KOB, Doc. 12 in 2:15-cv-02045-KOB, Doc. 11 in 2:15-cv-02046-KOB, Doc. 13 in 2:15-cv-02047-KOB, Doc. 10 in 2:15-cv-02048-KOB, Doc. 15 in 2:15-cv-02049-KOB, Doc. 13 in 2:15-cv-02050-KOB, Doc. 11 in 2:15-cv-02051-KOB, Doc. 17 in 2:15-cv-02052-KOB, Doc. 13 in 2:15-cv-02054-KOB, Doc. 13 in 2:15-cv-02055-KOB, Doc. 13 in 2:15-cv-02056-KOB, Doc. 9 in 2:15-cv-02057-KOB).

At issue in these Motions to Remand is whether these 13 cases properly invoke diversity jurisdiction. The Motions to Remand come in two versions: the motions in six cases contest complete diversity but do not contest that the amount in controversy exceeds $75,000; the motions in seven cases contest both complete diversity and that the amount in controversy

1

exceeds $75,000.[1] For ease of reference, because the diversity of citizenship arguments are identical in all 13 Motions to Remand and because the amount in controversy arguments are identical in the seven cases where Plaintiffs contest the amount in controversy, this court will refer to the Motion to Remand filed in case 2:15-cv-2045-KOB, which includes all the arguments before this court. *See* Motion to Remand, Anderson v. United States Pipe & Foundry Co., LLC, No. 2:15-cv-2045-KOB (N.D. Ala. Dec. 1, 2015), ECF Doc. 12. All docket references are to the lead case, 2:15-cv-2040-KOB, except where noted otherwise.

## I.      Procedural Background

Plaintiffs filed 24 total related lawsuits in Jefferson County circuit court and Defendants removed 13 of them to this court. Plaintiffs filed their Motions to Remand on December 1, 2015. The court consolidated these 13 cases on December 2, 2015. (Doc. 13). On motion by the Plaintiffs, the court partially stayed proceedings pending a decision on the Motions to Remand. (Doc. 16). Then, on joint motion by the parties, the court fully stayed proceedings pending mediation. (Doc. 42). The mediation stay expired on September 30, 2016, at which time the parties indicated that mediation was unsuccessful and that they were prepared to proceed with motion practice. *See* (Docs. 45, 54).

The court held a hearing on the Motions to Remand on November 14, 2016, at which time it directed Defendants to submit to Plaintiffs and file with the court an additional affidavit regarding business activities at USP Holdings, Inc.'s Rosemont, Illinois headquarters. *See* Transcript of Hearing at 80, Abner v. United States Pipe & Foundry Co., LLC, No. 2:15-cv-

---

[1] The seven cases where the amount in controversy is at issue are 2:15-cv-02045-KOB, 2:15-cv-02046-KOB, 2:15-cv-02047-KOB, 2:15-cv-02051-KOB, 2:15-cv-02055-KOB, 2:15-cv-02056-KOB, and 2:15-cv-02057-KOB.

2040-KOB (N.D. Ala. Nov. 14, 2016); *see also* (Doc. 64-8 [redacted], Doc. 68-9 [sealed]).

Following a status conference at which the parties addressed the need for further jurisdictional

discovery, Defendants submitted to the court supplemental briefing on the Motions to Remand.

(Doc. 64 [redacted], Doc. 68 [sealed]). Plaintiffs indicated they would rest on their briefs. (Doc.

66). The court is now prepared to rule on the Motions to Remand.

## II.    Factual Background

Plaintiffs have brought several state law claims related to Defendants' release of chemical

contaminants into areas occupied or frequented by Plaintiffs. Defendants allegedly owned and

operated a pipe-making facility in Birmingham, Alabama, which closed in 2010, that was the

source of these contaminants. Each Plaintiff claims to have contracted one or more of the "linked

diseases" identified in the Complaints; in addition, some Plaintiffs claim property damage. The

"linked diseases" include anemia, various kinds of cancers, heart conditions, and kidney

disorders, among others. Plaintiffs allege that Defendants' actions were conducted with

"intentional, malicious, wanton, willful, grossly negligent, and/or reckless indifference," and

request compensatory, special, exemplary, punitive, and all other damages to which they may be

entitled. (Doc. 1-1 at 23).

Plaintiffs are primarily citizens of Alabama.[2] They have sued three defendants: (1) U.S.

Pipe & Foundry Company (USPF), a LLC headquartered in Birmingham, Alabama whose sole

member is USP Holdings, Inc.; (2) USP Holdings, Inc. (USP Holdings), a Delaware corporation,

_____

[2] Eight cases have one to four plaintiffs who are citizens of the following states: Connecticut, New Jersey, Florida, Virginia, Texas, California, New York, Michigan, Ohio, and Kentucky.

headquartered at the time this action was removed[3] in Rosemont, Illinois, whose principal place of business is disputed; and (3) Mueller Water Products, Inc. (Mueller), a Delaware corporation with its principal place of business in Atlanta, Georgia.[4]

USP Holdings was formed in 2012 and owned four subsidiaries, including USPF. USP Holdings's operations consist of reviewing its subsidiaries' financial performance, approving its subsidiaries' financial statements, evaluating debt compliance, making budgeting decisions, evaluating and approving acquisitions, and determining a strategic plan for its assets. USP Holdings's Board was responsible for making all of the decisions regarding these operations. The Board consisted of five members: two lived in Florida, one lived in Illinois, one split his time between Michigan and Illinois, and one split his time between Alabama and Illinois. The Board held quarterly meetings, at which it made decisions regarding USP Holdings's activities, finances, and strategy.

Two of the Board members were employed by Wynnchurch Capital Ltd., USP Holdings's affiliate, with whom USP Holdings shared a physical address in Rosemont. One of these Wynnchurch employees worked at the Rosemont headquarters and served as the "point person" for USP Holdings's communications and documents. USP Holdings's CFO took minutes of the

---

[3] For the purpose of deciding jurisdiction, the court looks to the facts at the time of removal; changes in citizenship subsequent to removal do not divest the court of jurisdiction. *See Poore v. American-Amicable Life Ins. Co. of Texas*, 218 F.3d 1287, 1290–91 (11th Cir. 2000), *overruled on other grounds by Alvarez v. Uniroyal Tire Co.*, 503 F.3d 639 (11th Cir. 2007). Therefore the facts concerning USP Holdings will consistently be those at the time of removal. However, the court takes judicial notice of the fact that USP Holdings was sold by its parent companies to a Texas-based company in 2016. *Wynnchurch Capital and Comvest Partners Sell U.S. Pipe*, WYNNCHURCH CAPITAL (April 18, 2016),
http://www.wynnchurch.com/news/wynnchurch-capital-and-comvest-partners-sell-us-pipe.

[4] Plaintiffs also name Fictitious Defendants A-C, whose citizenship the court does not consider in assessing whether diversity jurisdiction is present. *See* 28 U.S.C. § 1441(b).

4

Board's quarterly meetings and maintained electronic copies at the Rosemont headquarters. The CFO also received financial information from USP Holdings's subsidiaries and distributed it by email to the other Board members. Corporate records were maintained electronically at the Rosemont headquarters.

In his initial affidavit, submitted with Defendants' Response to the Motion to Remand, Board member Paul Ciolino averred that the Board typically conducted its quarterly meetings via telephone, with the Board members phoning in from their respective states. Mr. Ciolino stated that he had "participated in these telephonic meetings from a number of locations, including often from Illinois." (Doc. 20-1 at 3-4). That affidavit did not specify where non-telephone meetings were held or from where in their respective states the Board members called.

In their Supplemental Materials filed in response to the Motion to Remand, Defendants included an additional affidavit by Paul Ciolino. In this second affidavit, Mr. Ciolino explained in greater detail precisely what activities occurred at USP Holdings's headquarters. Mr. Ciolino clarified that the Board had held at least thirteen Board meetings from August 2012 to September 2015, with at least seven of them taking place at the Rosemont, Illinois headquarters and only one taking place in Birmingham, Alabama. The Board meetings not held in person were held via telephone. This supplemental affidavit further clarified that the Board held monthly telephonic meetings to review USP Holdings's subsidiaries' key performance indicators. The Board members generally phoned in for these meetings from their respective states.

Plaintiffs maintain that statements in Mr. Ciolino's supplemental affidavit contradict his first affidavit. The court observes that the differences between Mr. Ciolino's first and second affidavits are insignificant and that his supplemental affidavit provides more details that clarify

information absent from or unclear in his first. The court finds immaterial the discrepancy between the first affidavit's assertion that board meetings "typically" occurred via telephone and the second affidavit's statement that eight—two more than half—board meetings occurred at Rosemont, especially given the second affidavit's statement that the Board also meets monthly via telephone.

For the seven cases where amount in controversy is disputed, Defendants submitted to the court the injury-specific information they received from Plaintiffs prior to these lawsuits being filed. (Doc. 24). Defendants received such specific information for 244 of the 451 Plaintiffs in the seven cases where amount in controversy is disputed. The claimed injuries vary among the seven cases but include seizures/epilepsy, mental retardation, asthma, anemia, heart attack, repeat miscarriages, developmental delay, behavioral problems, decreased IQ, kidney failure, COPD, emphysema, cancer, vision and hearing problems, and others.

## III.    Discussion

Removal here is based on diversity jurisdiction. Defendants may remove from state to federal court a case over which a district court could exercise original jurisdiction. 28 U.S.C. § 1441(a). District courts have original jurisdiction over all civil suits where the amount in controversy is more than $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1).

The removing party bears the burden of demonstrating that federal jurisdiction exists by a preponderance of the evidence. *See Bryant v. Ally Financial*, 452 F. App'x 908, 910 (11th Cir. 2012) (quoting *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002)). "[B]ecause removal jurisdiction raises significant federalism concerns, federal courts are directed to construe

6

removal statutes strictly. Indeed, all doubts about jurisdiction should be resolved in favor of remand to state court." *City of Vestavia Hills v. Gen. Fidelity Ins. Co.*, 676 F.3d 1310, 1313 (11th Cir. 2012) (internal quotation marks omitted) (quoting *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir.1999)).

### A.      Diversity of Citizenship

A limited liability company is a citizen of every state of which one of its members is a citizen. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).

A corporation is a citizen of both its state of incorporation and the state where it maintains its principal place of business, or its "nerve center." *See* § 28 U.S.C. 1332(c)(1) (2012); *Hertz v. Friend*, 559 U.S. 77, 80–81 (2010). The nerve center is typically found at a corporation's headquarters and is the place "where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 80–81. If the record shows attempted manipulation, for example that the supposed nerve center is merely "a mail drop box, a bare office with a computer, or the location of an annual executive retreat," courts are to ascertain the actual place of direction and control. *Id.* at 97.

Thus, USPF, whose sole member is USP Holdings, a corporation, is a citizen of the state(s) in which USP Holdings is incorporated and maintains its nerve center.

The Supreme Court in *Hertz* court acknowledged that, under the nerve center test,

> there will be hard cases. For example, in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet. That said, our test nonetheless points courts in a single direction, towards the center of

7

> overall direction, control, and coordination. Courts do not have to try
> to weigh corporate functions, assets, or revenues different in kind,
> one from the other. Our approach provides a sensible test that is
> relatively easier to apply, not a test that will, in all instances,
> automatically generate a result.

*Hertz*, 559 U.S. at 95–96.

The court first addresses Defendants' assertion that they need not prove that USP Holdings's principal place of business at the time of removal was in Rosemont, so long as they prove that the principal place of business was not in a state that would defeat diversity. *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1248 n.2 (11th Cir. 2005) (stating that a corporate defendant need not prove the precise location of its principal place of business if it demonstrates that the principal place of business is in a state that does not defeat complete diversity). The court is additionally persuaded by Defendants' argument that *Hertz* does not overrule this point of circuit law, because nowhere does that decision mandate the court to find the single location of the nerve center. *See, e.g.*, *Hertz*, 559 U.S. at 96 ("[O]ur test nonetheless *points courts* in a single direction . . . ."). However, no express holding on this point is necessary, because the court can readily identify USP Holdings's principal place of business.

 Plaintiffs contend that USP Holdings was formed for the sole purpose of being the holding company of USPF. They argue that USP Holdings should be deemed to have its principal place of business in Jefferson County, Alabama because that is where USPF is headquartered and maintains its pipe-making operations, and so "all of the apparent business activity" of both companies takes place in Jefferson County, Alabama. (Doc. 12 at 11).

Although the Eleventh Circuit has not addressed this issue, the Third Circuit squarely rejected the argument that the business operations of a LLC subsidiary are imputed to its holding

company because the holding company effectively delegates management of the LLC's

day-to-day operations, making the holding company a citizen of the state where the LLC's

business operations are located. See *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337,

350–51 (2013). Such a theory would, in a sort of *renvoi*, turn the rule on its head that LLCs are

citizens where their members are citizens—which would be illogical given the ubiquity of

holding companies. *See id.* The court reaffirmed the need to view the business of the holding

company apart from the business of a subsidiary. *See id.* at 350.

Even if a holding company exists solely to own a LLC, its operations are separate and

distinct from the operations of the LLC. This holding is consistent with language in *Hertz*

emphasizing that form over substance is sometimes necessary in determining jurisdiction, even

though that preference may produce seemingly illogical results. *See Hertz*, 559 U.S. at 96

(discussing the anomaly that might result if most of a company's public business activities take

place in New Jersey but its high level officers direct those activities across the river in New

York).

The court finds the reasoning of the Third Circuit sound and **FINDS** that USP Holdings is

not a citizen of Alabama simply because one of the companies it owns has its principal place of

business in Alabama. *Accord Motyl v. Franklin Templeton Cos., LLC*, No. 13-60967-CIV, 2014

WL 1413434, at *4 (S.D. Fla. Apr. 11, 2014) (finding a holding company's principal place of

business in San Mateo, California, because the majority of its officers were located there,

including the two who made recommendations to the rest of the board; board members returned

their signed copies of decisionmaking forms to the San Mateo office; and other board activities

were "coordinated and administered" from the city). Additionally, the fact that USP Holdings

9

held three companies besides USPF belies any suggestion that Defendants engaged in jurisdictional manipulation by forming the holding company.

The overwhelming majority of USP Holdings's high-level command, control, and directing activities took place at the Rosemont headquarters. Though the company's activities are themselves fairly limited, a significant portion of them occurred at Rosemont; most importantly, a majority of the quarterly meetings where the Board made key decisions related to USP Holdings's operations were held at Rosemont. In addition, both the "point person" for USP Holdings and significant stored documents were located at Rosemont. One board meeting in Birmingham does not a nerve center make.

The significance of a jurisdictional fact may vary based on the scope of a corporation's activities. *See Johnson*, 724 F.3d at 354. Thus, though the Court in *Hertz* cautioned against finding a principal place of business at a location where executives merely meet for board meetings, *see* 559 U.S. at 93, "[f]or a holding company . . . relatively short, quarterly board meetings may well be all that is required to direct and control the company's limited work." *Johnson*, 724 F.3d at 354. Similarly, although the Court in *Hertz* warned against finding the principal place of business at a bare office with a computer, here an office in a physical building—where a majority of meetings took place, significant corporate documents were stored, and two of five Board members were employed—is relatively significant.

The court **FINDS** that "the room where it happens" is located at the Rosemont, Illinois headquarters. *See* ORIGINAL BROADWAY CAST, *The Room Where It Happens*, HAMILTON (ORIGINAL BROADWAY CAST RECORDING) (Atlantic Recording Corp. 2015). The Supreme Court in *Hertz* emphasized that a corporation's headquarters is typically its principal place of business,

and the record here contains no facts compelling the court to stray from that presumption. No evidence of jurisdictional manipulation exists; the court's doubts, expressed at the hearing on these motions, over whether USP Holdings's principal place of business was in fact located at its headquarters were related to determining the principal place of business for a company that conducts meetings primarily via telephone—not to concerns that decisionmakers actually "arranged the menu, the venue, [and] the seating" elsewhere. *See id.* Mr. Ciolino's supplemental affidavit, however, sufficiently clarifies the business activities that took place at the Rosemont headquarters.

For these reasons, the court **FINDS** that the parties are of diverse citizenship.

## B.     Amount in Controversy

When a defendant asserts federal jurisdiction and the plaintiff contests the defendant's assessment of the amount in controversy, removal is appropriate only if the court finds by a preponderance of the evidence that the amount in controversy exceeds $75,000. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553–554 (2014). When the complaint does not specify a dollar amount for damages, the court may nonetheless determine that the amount in controversy is facially apparent from the complaint. *See Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010) (quoting *Williams v. Best Buy Co. Inc.*, 269 F.3d 1316, 1319 (11th Cir. 2001)).

Defendants may submit—and the court may require if the amount in controversy is not ascertainable from the complaint—evidence to support the jurisdictional allegations made in the notice of removal. *See Pretka*, 608 F.3d at 754–55. Defendants may combine such evidence "with reasonable deductions, reasonable inferences, or other reasonable extrapolations" to prove

11

that the amount in controversy exceeds $75,000. *See id.* at 754. "That kind of reasoning is not akin to conjecture, speculation, or star gazing." *Id.* Further, the court is permitted to rely on its own "judicial experience and common sense" in assessing whether allegations in a complaint support a finding of an amount in controversy above $75,000. *See Roe v. Michelin N. America*, 613 F.3d 1058, 1062 (11th Cir. 2010). "The point is that a removing defendant is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it." *Pretka*, 608 F.3d at 754.

A plaintiff's assertion that he seeks *up to* a certain amount in damages is to be given some, but not determinative, weight. *See Roe*, 613 F.3d at 1061 (citing *Pretka*, 608 F.3d at 771) ("[T]he district court is not bound by the plaintiff's representations regarding its claim, nor must it assume that the plaintiff is in the best position to evaluate the amount of damages sought."); *Harris v. Aghababaei*, 81 F. Supp. 3d 1278, 1283 (M.D. Ala. 2015) (noting that plaintiffs' representations of their damages "cannot be determinative," but were "another relevant factor in assessing the amount in controversy").

That a plaintiff's requested damages cannot be the final word on the amount in controversy is especially true because Alabama law permits recovery in excess of stated damages. *See* ALA. R. CIV. P. 54(c)). Moreover, "[p]unitive damages must be considered when determining the jurisdictional amount in controversy in diversity cases." *Rae v. Perry*, 392 F. App'x 753, 755 (11th Cir. 2010) (citing *Holley Equip. Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987)). However, because of the duty of candor attorneys owe under Rule 11, the court should give great deference to a plaintiff's assertions that he does not seek and will not accept more than $75,000 in damages. *See, e.g., Federated Mut. Ins. Co. v. McKinnon*

12

*Motors, LLC*, 329 F.3d 805, 808 (11th Cir. 2003) (plaintiff represented that it did not seek and *would not accept* more than $74,000 in damages); *Harris*, 81 F. Supp. at 1280, 1283 (plaintiffs repeatedly stated that their damages did not exceed $74,500 and represented that they would not seek more than that amount).

The Eleventh Circuit has strongly discouraged reliance on jury awards in other cases to determine the amount in controversy, because dollar amounts do not capture important distinguishing factors like causation. *See, e.g.*, *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1221 (11th Cir. 2007) ("[T]he facts regarding other cases tell us nothing about the value of the claims in this lawsuit. . . . Absent specific detail about the present action, [citation to other cases] in no way clarifies the aggregate value of the claims here."); *Federated Mut. Ins. Co.*, 329 F.3d at 809 (stating that "mere citation" to "a number of Alabama cases where courts have awarded punitive damages well in excess of $75,000 for bad faith failure to pay" could not "overcome the indeterminate and speculative nature of [plaintiff's] assertion in this case").

The amount in controversy for a multiple-plaintiff case may be determined based on one plaintiff's claim exceeding the jurisdictional threshold. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005) (holding that a court may exercise supplemental jurisdiction over additional plaintiffs' claims that are part of the same case or controversy but do not meet the jurisdictional threshold, provided that one plaintiff's amount in controversy does exceed $75,000 and the supplemental claims do not defeat diversity of citizenship).

First, the court declines to rely on citations to jury awards in other cases to determine the amount in controversy, except to the extent that they place judicial experience and common sense in context. Defendants have presented many cases (most from Alabama state courts) involving

13

the "linked diseases," each of which produced a jury award that exceeded $75,000. Without a detailed analysis of causation in each of those past cases and comparison to the causation alleged in the instant cases, the court cannot assess whether those awards suggest an amount in controversy in excess of $75,000 here. However, the court takes judicial notice of those award figures and recognizes that $75,000-plus damages awards for similar claims are, at least, not unreasonable.

Second, the court will not examine settlement valuations in assessing the amount in controversy. Plaintiffs argue that during settlement discussions, all Plaintiffs' claims were, on average, valued at less than $10,000 per individual Plaintiff's case by Plaintiffs and less than $4,000 per individual case by Defendants. Plaintiffs claim that because these numbers are so far below the $75,000 threshold, Defendants cannot show now that the amount in controversy exceeds that threshold. The court notes first that *averaging* claims' settlement values does not account for differences in individual Plaintiffs' claims, and that only one Plaintiff in each case must assert a claim whose value satisfies the amount in controversy. Further, for reasons the court discussed at the hearing, settlement offers do not represent the expected litigation value of claims, and the settlement offers here did not include medical records or any other way to assess the actual value of Plaintiffs' claims. *See, e.g.*, *Montgomery v. Food Giant Supermarkets, Inc.*, No. 14–0405–WS–C, 2014 WL 5307890, at *3 (S.D. Ala. 2014) ("[Plaintiff's] demand letter is a barebones document that sets forth a dollar figure, but offers precious little in the form of specific information explaining how that figure was derived or how it might represent an honest assessment of [plaintiff's] damages."); *Jackson v. Am. Bankers Ins. Co. of Fla.*, 976 F. Supp. 1450, 1454 (S.D. Ala. 1997) ("[I]t is not the settlement value of a case that determines whether

14

the jurisdictional amount is in controversy. The appropriate measure is the litigation value of the case assuming that the allegations of the complaint are true and assuming a jury returns a verdict for the plaintiff on all claims made in the complaint.").

Though Plaintiffs claim to have consistently represented their damages as being below the jurisdictional threshold, they have not stipulated under oath or even represented that no Plaintiff would accept damages above $75,000. The court takes seriously Plaintiffs' request for damages "up to a total of $74,999" but does not find it determinative, particularly given that the Complaints in the cases where the amount in controversy is contested are substantially identical to the Complaints in cases where the amount in controversy is not contested. (Doc. 1-1 at 21 in 2:15-cv-2015-KOB). Given the nature of Plaintiffs' claims, including the fact that they are asking for punitive damages, this court can readily find that the amount in controversy for each of these seven cases is greater than $75,000.

Given the nature of the injuries claimed and Plaintiffs' allegations that Defendants acted with "intentional, malicious, wanton, willful, grossly negligent, and/or reckless indifference" in releasing chemical contaminants into the air over decades, the court **FINDS**, by reliance on its own judicial experience and common sense, that it is more likely than not that at least one Plaintiff's claim in each of these seven cases exceeds $75,000. For example, each of the seven cases includes a claim involving at least one of the following: mental retardation, anemia, heart attack, developmental delay, kidney failure, cancer, and repeat miscarriages. Plaintiffs suffering from these conditions alone are more likely than not to incur significant medical expenses. Specific ailments likely involve other damages, such as increased living expenses for mental retardation and accompanying emotional distress for repeat miscarriages. Pursuant to the

15

discussion here, on the record, and in Defendants' supplemental brief, the court **FINDS** that each case has at least one Plaintiff whose claims place in controversy more than $75,000.

Finally, the court **FINDS** that, if proven, Plaintiffs' allegations would more likely than not result in punitive damages that would bring awards to more than $75,000. Plaintiffs argue that to generally rely on "punitive damages" as bringing the amount in controversy across the jurisdictional threshold is impermissibly speculative. The Plaintiffs pled punitive damages so the court is bound to consider punitive damages in assessing the amount in controversy, and agrees with Defendants that the alleged nature of Defendants' century-long conduct, if proven, resulting in Plaintiffs' alleged injuries would more likely than not result in significant punitive damages awards.

Accordingly, the court **FINDS** that the amount in controversy exceeds the jurisdictional threshold in each of the seven cases where the amount is contested.

## IV.    Conclusion

For the reasons stated above, the court **DENIES** Plaintiffs' Motions to Remand in these 13 cases. The court also **LIFTS** the stay imposed pending a decision on the Motions to Remand. The court will enter a separate Order consistent with this opinion.

**DONE** this the 10th day of February, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE